Melva A. SCHALK, Plaintiff–Appellant,

v.

James GALLEMORE,
Defendant–Appellee.

No. 89–3220.

United States Court of Appeals,
Tenth Circuit.

June 20, 1990.

James S. Phillips, Jr. of Phillips & Phillips, Wichita, Kan., for plaintiff-appellant.

Steven C. Day of Woodard, Blaylock, Hernandez, Pilgreen & Roth, Wichita, Kan., for defendant-appellee.

Before LOGAN, JONES,* and SEYMOUR, Circuit Judges.

PER CURIAM.

Plaintiff-appellant Melva Schalk appeals the district court's order granting summary judgment in favor of defendant-appellee James Gallemore on her First Amendment claims asserted under 42 U.S.C. § 1983. In this appeal, Schalk alleges Gallemore violated her First Amendment rights when, as chief administrator of a publicly owned hospital, he fired her for writing a letter to, and later speaking with, hospital board of trustees members about management practices. Gallemore denies there was any First Amendment violation and argues, in the alternative, that he is immune from liability for civil damages.[1]

I

Schalk was employed at St. Luke's Hospital in Wellington, Kansas, for approximately eighteen years prior to her termination in August 1986. St. Luke's is a municipally owned hospital governed by a publicly elected board of trustees. At the time she was terminated, Schalk was a part-time patient accounts clerk. Before his appointment as chief administrator, Gallemore was Schalk's immediate supervisor.

At some time subsequent to Gallemore's appointment, Schalk became concerned about what she perceived to be "waste," "inefficiency," and "favoritism" at the hospital. Appellant's Addendum at A–1, Schalk Affidavit at 2. In November 1985, Schalk hand-delivered a four-page letter to the hospital board members and the city council expressing concern over various hospital matters, including specific concerns regarding certain hospital employees. In the letter, she requested that the trustees schedule time for her to speak at the next board meeting to discuss her concerns. Schalk stated that Gallemore had refused to let her address the board as a group, but invited her to speak to them individually.

The first two pages of the letter raise questions regarding specific instances of problems with employees. It states, in part, as follows:

"Do kitchen employees pay for their food as was requested in Department Head meeting a few months ago? Why does an employee in the kitchen get to leave the building every day to take her children to school on our time? Why do

---

* The Honorable Nathaniel R. Jones, Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

1. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R. App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

some salaried people have to work 6 hours a day and others 8? There are some salaried people who do not even work 6. Why did they pay $1,000.00 for [one employee] to take Lamaze instructions when [another employee] already knew how and would have taught?"

Appellant's Addendum at A–16.

The second two pages are designated "personal complaints" and consist mainly of Schalk's personal observations and concerns about hospital administration and a dispute she had with a nurse supervisor in 1983. The second section also includes a complaint related to Schalk's failure to get a pay raise. In the letter's last paragraph Schalk requests that the board intervene to improve hospital management and, consequently, raise employee morale.

On December 4, 1985, the board of trustees sent Schalk a written response. The board outlined each question or issue and answered it. In this response, Gallemore's position was clarified. The board stated:

"The Administrator's reply to your request [to be placed on the agenda] was as follows: That he would not place you on the agenda. He suggested that you discuss these matters with any or all of the members of the board of trustees, and after you have had these discussions, if any Board Member feels this topic is suitable for discussion at the Board Meeting, they can request it be placed on the agenda and he would certainly do that.

The Administrator further advised you that matters of this nature were normally discussed in Executive Sessions and that you might or might not be present during the executive Session. Your reply was, that;s fair.' [sic] You further replied, 'and after that I will be fired.' The administrator's reply was, 'no.'"

Appellant's Addendum at A–40.

The board did not specifically respond to the last paragraph of the letter. The board did, however, take action based on at least one of the concerns raised.

In a subsequent counseling session with Gallemore and her immediate supervisor, Jerry Zoglmann, Schalk was formally reprimanded for writing the letter. Her written reprimand describes the violation as follows:

"With reference to a four page list of questions and allegations concerning management practices in the Hospital.... This list was prepared, signed and submitted to members of the Board of Trustees and members of the city council by Melva Schalk.... None of the questions ask [sic] or allegations made in the four page list, referred to above, relate to any area of responsibility associated with your job or position in the Hospital. In the future, if you wish to continue as an employee of the Hospital, complaints of this nature that do not directly relate to your job or its performance will not be tolerated and will be considered as unacceptable conduct on your part. I refer specifically to the Personnel Policies page 10, items 12, 14, 15, and 19 that cover Disciplinary Action.

Any further conduct of this nature, in violation of policies covering employee conduct, will result in immediate discharge."

Appellee's Addendum at App. C. As a result of this session, it was Schalk's understanding that she could not approach the board as she had done in the past. However, she did not believe she was prohibited from speaking casually with board members if she saw them.

On August 16, 1986, Schalk encountered board member Richard Strait in a local grocery store. She told him she wanted to meet with the board to discuss problems and concerns she had regarding waste and inefficiency at the hospital, specifically including her concern over nurses sleeping on the job. The following week, Gallemore was made aware of this conversation, and Schalk was terminated.

Gallemore testified in his deposition that he fired Schalk because she spoke with board member Strait. He also took into account the letter she wrote to the board and city council members. Gallemore readily admitted Schalk's 1986 employee review identified her as an "above average" employee. He agreed that her per-

formance on the job had nothing to do with the termination.

Schalk ran for and was elected to the hospital board of trustees in April 1987. A number of Wellington newspaper articles from 1987–88 indicate that the hospital was having severe financial difficulty which dated back several years. *See* Appellant's Addendum at A–11. It is worth noting that Schalk raised the issue of fiscal problems in her 1985 letter some two years earlier. Defendant Gallemore resigned as administrator effective January 1, 1988.

Schalk brought suit against Gallemore in June 1988, asserting that he violated her First Amendment rights to freedom of association and to petition the government for redress of grievances. She also asserted that the rule prohibiting her from speaking to board members constituted a prior restraint on her speech.[2] Gallemore filed a motion for summary judgment arguing that there was no First Amendment violation. In the alternative, he argued he was immune from suit. The district court granted summary judgment on all claims and did not reach the immunity issue. *Schalk v. Gallemore,* 718 F.Supp. 862, 868 (D.Kan.1989).

## II

### A. *Standard of Review*

On appeal, we review the granting of a motion for summary judgment de novo, and apply the same standard as the district court. *Conaway v. Smith,* 853 F.2d 789, 792 (10th Cir.1988). Summary judgment is appropriate only when there are no genuine issues of fact, and one party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Here, the evidence must be viewed in the light most favorable to the appellant, as the nonmoving party. *Conaway,* 853 F.2d at 792 n. 4.

In First Amendment cases in particular, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1985, 80 L.Ed.2d 502 (1984) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964)). The threshold issue of whether Melva Schalk's speech is protected is one of law. *Connick v. Myers,* 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983); *Koch v. City of Hutchinson,* 847 F.2d 1436, 1441 (10th Cir.) (en banc), *cert. denied,* 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).

### B. *Freedom of Speech*

It is now axiomatic that a governmental entity cannot condition employment "on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick,* 461 U.S. at 142, 103 S.Ct. at 1687. In analyzing whether a public employer's actions impermissibly infringe on free speech rights, the Supreme Court has adopted a multi-tier test. *Melton v. City of Oklahoma City,* 879 F.2d 706, 713 (10th Cir.), *reh'g granted on other grounds,* 888 F.2d 724 (1989).

First, the court must decide whether the speech at issue touches on a matter of public concern. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689; *Melton,* 879 F.2d at 713. If it does, the court must balance the interest of the employee in making the statement against the employer's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968). Third, if the preceding prerequisites are met, the speech is protected, and plaintiff must show her expression was a motivating factor in the detrimental em-

---

**2.** In his response brief, Gallemore asserts the prior restraint issue was not raised below. However, in Schalk's response to the motion for summary judgment she argued that Gallemore's actions in limiting her ability to air grievances was "tantamount to a prior restraint on First Amendment activity." *See* Plaintiff's Memorandum in Opposition to Motion for Summary Judgment at 18.

ployment decision. *Mount Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Finally, if the plaintiff sustains this burden, the employer can still prevail if it shows by a preponderance of the evidence that it would have made the same decision regardless of the protected speech. *Id.*

### 1. Public Concern Analysis

 To determine whether employee speech touches on a matter of public concern, we look at whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690. This examination requires analysis of the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690. When the content of the speech focuses on disclosing public officials' malfeasance or wrongdoing, it is likely to be considered a matter of public concern. *Wulf v. City of Wichita,* 883 F.2d 842, 857 (10th Cir.1989) (and cases cited therein). Conversely, speech is generally not protected if the aim is simply to air grievances of a purely personal nature. *Id.* The pertinent inquiry is whether the actor is speaking as a citizen or an employee. *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690.

In this regard, it is not enough that the topic of the speech be of general interest to the public; in addition, what is *actually said* must meet the public concern threshold. *Wilson v. City of Littleton,* 732 F.2d 765, 769 (10th Cir.1984) (emphasis added). In drawing the thin line between a public employee's speech which touches on matters of public concern, and speech from the same employee which only deals with personal employment matters, we have looked to the subjective intent of the speaker. *McEvoy v. Shoemaker,* 882 F.2d 463, 466 (10th Cir.1989); *see also Conaway,* 853 F.2d at 796 (focus on motive of the speaker to determine whether speech was calculated to disclose misconduct). After examining the record here, we hold Schalk's letter and her comments to board member Strait in the grocery store do constitute speech touching on matters of public concern.

Schalk wrote and delivered the letter on her own time. While Schalk expressed concern over a wide range of internal employee situations, the overall tone and underlying message is directed to waste, inefficiency, and favoritism at the hospital. The first two pages of the letter are certainly more "public" in outlook than are the second two pages. The last paragraph of the letter, however, connects all of the stated concerns to perceived problems with hospital administration. In fact, the board's response characterizes Schalk's communication as a request to speak with the members about "management practices." In other contexts, similar issues have been held to be matters of public concern. *Czurlanis v. Albanese,* 721 F.2d 98, 104 (3d Cir.1983) (allegations of waste, inefficiency, and possibly fraudulent county practices are issues of public concern); *Rookard v. Health & Hosps. Corp.,* 710 F.2d 41, 46 (2d Cir.1983) ("[a]n allegation of corrupt and wasteful practices at a large municipal hospital, made to the city official empowered to investigate such charges, obviously involves a matter of public concern"); *see also Coats v. Pierre,* 890 F.2d 728, 732 (5th Cir.1989) (allegations of favoritism in grading at university constitute matter of public concern).

Further, we note the statements were not made in the context of an ongoing personal employment grievance. *See Connick,* 461 U.S. at 148, 103 S.Ct. at 1690 (speech was merely extension of an internal employee dispute). Gallemore admits Schalk's job performance was not a factor in the termination. Additionally, she was not addressing her supervisor or a co-worker, but public officials specifically elected to oversee the efficiency and financial stability of the hospital. *See Czurlanis,* 721 F.2d at 104 (fact that plaintiff raised the issues before legislative body empowered to investigate is significant in public concern analysis). The concerns are not exempt from public concern status merely because Schalk became aware of them through her employment. *Id.*

The record indicates hospital board meetings are open to the public. Therefore, as a public citizen, Schalk could approach the board with these concerns and would be welcomed in doing so. Only her status as

an employee prevented her from doing that here. This fact is especially pertinent, as Schalk was later elected to the hospital board. While the lower court did not find this fact dispositive, it clearly supports her statement that she was motivated out of her concern as a citizen and a taxpayer. It also creates a strong inference that her motives were not retaliatory or in any way related to displeasure with her position.

Although the issues Schalk raised do resemble a "laundry list" instead of a commentary on public issues, she should not be penalized for her lack of eloquence. When reviewed in context, her letter implicates the fiscal policies of the defendant and attempts to disclose waste and wrongdoing. Further, although Gallemore asserts that the statements are not truthful, there is no evidence that Schalk knowingly or recklessly made false statements, which could void any protected status. *Pickering*, 391 U.S. at 574–75, 88 S.Ct. at 1738; *Wulf*, 883 F.2d at 859.

The news articles printed in the Wellington paper in 1987–88 also support our assessment that Schalk's concerns in 1985 were a matter of public concern. Obviously the local newspaper thought the financial stability of St. Luke's was newsworthy.[3] In many instances, the news articles address efficiency at the hospital. Although these issues might not be newsworthy in a larger community, the record here reflects that the financial stability of St. Luke's was a topic of public concern in Wellington, Kansas. We see no meaningful distinction between allegations of waste in a large municipal hospital as compared to those in a small community. *See Rookard*, 710 F.2d at 46. Consequently, we find the first two pages of the Schalk letter constitute matters of public concern. Therefore, we move on to the second level of the four-part test.

### 2. The *Pickering* Balancing Test

■ The task under *Pickering* is to "balance the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734–35. Pertinent considerations include: "[w]hether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). The *Rankin* Court also considered the manner, time, and place of the employee's expression, as well as the context in which the dispute arose. *Id.* The focus is necessarily centered on intradepartmental relationships and performance. *Melton*, 879 F.2d at 715.

This court has held that an employee's First Amendment rights must be protected "unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir. 1986) (quoting *Childers v. Independent School Dist. No. 1*, 676 F.2d 1338, 1341 (10th Cir.1982)), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987). The government must produce evidence of an actual disruption of services which results from the employee's speech. *Melton*, 879 F.2d at 715–16.

Here, Gallemore argues the speech was disruptive to the efficient operation of the hospital because he could no longer "realistically have fulfilled his obligations as administrator ... in the face of Melva Schalk's activities." Brief of Appellee at 31. Specifically, he asserts Schalk's uncomplimentary remarks created hostility which made it impossible for him to handle hospital matters. While these arguments have superficial appeal, Gallemore submitted no actual evidence of any disruptive confrontations. The existence of some ani-

---

**3.** This case is distinguishable from our discussion of media publicity in *Koch v. City of Hutchinson*, 847 F.2d at 1448 ("Media publicity of the dispute is not determinative of the question of whether *Koch's* speech was on a matter of public concern...."). There, it was the employee's dispute itself which was reported. Here, the financial stability of the hospital was reported as a distinct news item, thereby supporting the argument that it was a matter of public concern in the community.

mosity between Schalk and those she identified in her letter is not dispositive. *See Conaway*, 853 F.2d at 798 ("It would be anomalous to hold that because the employee's whistle blowing might jeopardize the harmony of the office or tarnish the integrity of the department, the law will not allow him to speak out on his perception of potential improprieties or department corruption."). There is no testimony nor even an allegation that Schalk's work was affected by the reprimand she received following her submission of the letter. To the contrary, there is evidence in the record that Schalk's performance was rated above average after the reprimand. Moreover, unlike other positions, the job of patient accounts clerk does not involve working relationships necessitating an especially high degree of personal loyalty or confidence.[4] In fact, Schalk describes her position as involving a great deal of paperwork.

There is no suggestion that the letter impugned Gallemore's ability to discipline Schalk or others, nor is there evidence that she encouraged other employees to take action against Gallemore or the hospital. In fact, the record demonstrates Schalk and Gallemore had no problems between December 1985 and the time of her dismissal some eight months later. Although Gallemore states there was "extreme hostility" at the hospital, there is absolutely no deposition testimony supporting this conclusion. Because Gallemore has not alleged any disruption as a result of Schalk's actions, and we fail to see any, we hold the *Pickering* balance tips in favor of Schalk.[5]

### 3. Motivating Factor Test

Because we have concluded the speech was protected, we turn to Schalk's allega-

tions that it was a motivating factor in her termination. *Mount Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. If Schalk successfully proves that her speech activities were such a motivating factor, Gallemore then has the burden of showing the employment decision would have been the same regardless of the protected speech. *Id.* Generally these are factual determinations which, in the event of disagreement, would preclude summary judgment. *Melton*, 879 F.2d at 713. However, there appears to be no disagreement over the role of Schalk's speech activity in her termination. Gallemore admitted in his deposition that he terminated Schalk for speaking with board member Strait and, to a lesser extent, for writing the letter; he also admitted that her job performance was not a factor in the termination decision. *See* Appellant's Addendum at A–50, A–51a, A–52. Therefore, we must conclude based on the law and the undisputed facts before us that Schalk was terminated because of her protected speech activity.

### C. *Freedom of Association*

■ Schalk argues that in restricting her access to the board of trustees, Gallemore violated her right to freedom of association. The Supreme Court has recognized two types of association protected by the First Amendment.

"In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our

---

4. This case differs, therefore, from *Connick*, in which a close, loyal relationship between superiors and assistants was deemed vital to the accomplishment of the work. There is no evidence in the instant case suggesting that disagreements between Schalk and Gallemore would affect her ability to serve the hospital or the public.

5. Gallemore also asserts Schalk should have used internal grievance procedures to air her concerns. *See Johnsen v. Independent School Dist. No. 3*, 891 F.2d 1485, 1494 (10th Cir.1989) (decision to contact outside agencies prior to using internal procedures was unnecessarily disruptive). The grievance procedure of the hospi-

tal, however, states "a grievance is defined as any significant dissatisfaction arising from the job *except* complaints arising from termination for cause." (emphasis in original.) There is apparently no internal mechanism provided for bringing to light non-job-related hospital concerns. Further, both Schalk's letter and the board's response indicate Gallemore gave her permission to talk to board members. There is nothing in the record to suggest she disregarded any requests to use internal procedures. Finally, given the nature of her allegations, it was reasonable for her to forego any procedure requiring her to confront Gallemore directly. *See id.* at 1490 n. 4.

constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion."

*Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984).

Schalk's circumstances fit into neither of these two categories. There are no allegations that her right of "intimate association" was impaired by the restriction on speaking to board members. And, in this case, her right of "political association" is indistinguishable from her right to free speech. The "association" that she seeks is nothing more nor less than an audience for her speech. It therefore must collapse into the foregoing discussion regarding her right to free speech.[6]

D. *Right to Petition for Redress of Grievances*

Plaintiff's claim that her First Amendment right to petition was infringed is susceptible to the same disposition as her association claim. In the instant case, Schalk's right to petition is inseparable from her right to speak. As such, we see no reason to subject this claim to a different sort of analysis. *See McDonald v. Smith*, 472 U.S. 479, 482, 105 S.Ct. 2787, 2789, 86 L.Ed.2d 384 (1985) (characterizing right to petition as "an assurance of a particular freedom of expression"); *Day v. South Park Indep. School Dist.*, 768 F.2d 696 (5th Cir.1985) (right to petition is governed by "public concern" analysis of *Pickering*), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986).

## III

Gallemore has asserted that even if the speech is protected, he has qualified immunity which shields him from liability. Because we may affirm the trial court's decision on any grounds supported in the record, we proceed to consider the qualified immunity defense. *Scivally v. Time Ins. Co.*, 724 F.2d 101, 103 (10th Cir.1983).

A. *Gallemore's Official Capacity Immunity*

In her complaint, Schalk specifically states causes of action against Gallemore in both his individual and official capacities. The Supreme Court has noted that an "official capacity" suit is, in essence, a suit against the governmental entity. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). However,

"[a governmental entity] may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."

*Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). In order to be sued in this capacity, the municipality must receive notice and have an opportunity to respond. *Graham*, 473 U.S. at 166, 105 S.Ct. at 3105; *Melton*, 879 F.2d at 726 n. 30. It is unclear from the record whether the hospital was given notice or an opportunity to respond to this suit. In addition, factual issues exist relative to whether Gallemore's actions constituted hospital board policy. Therefore, we must remand for further proceedings on this issue.[7]

---

**6.** We do not hold that the "public concern" analysis is a necessary step in all public employee/freedom of association claims. *See Flanagan v. Munger*, 890 F.2d 1557, 1564 n. 7 (10th Cir.1989) (expressing doubt regarding applicability of "public concern" analysis to freedom of association claims). In some constitutionally protected associations, "public concern" may be an inapt tool of analysis. For example, a public school teacher fired for being married would have a colorable freedom of association claim against her employer, but would likely not satis-

fy the public concern test. We see no reason to treat speech and association differently in cases like the one at bar, however, where, in context, the two interests are clearly identical.

**7.** At the hearing on the motion for summary judgment, the district court inquired about the status of the official capacity suit. Counsel for Schalk stated he did not know whether the hospital had received notice of the lawsuit. Counsel for Gallemore stated the hospital did not. II R. 21–22.

**B.** *Qualified Immunity of Gallemore*

In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court outlined the standard for determining whether public officials will be found immune from liability in civil suits. It states that "government officials performing discretionary functions, generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. This determination is a question of law. *Id.; Melton*, 879 F.2d at 726. For purposes of this inquiry, a constitutional right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (emphasis added).

Reconciling these principles in First Amendment cases, however, proves a difficult task. While the particularized factual inquiry necessary in these cases decreases the likelihood that a defendant should have known his conduct was unconstitutional, an overly-broad application of qualified immunity would "effectively eviscerate whistle blower protection for public employees." *Melton*, 879 F.2d at 728 (quoting *Roth v. Veterans Admin.*, 856 F.2d 1401, 1408 (9th Cir.1988)). As we said in *Melton:*

"A simple black letter rule is not possible. What is clear is that *Harlow* places the presumption in favor of immunity for public officials acting in their individual capacities. *Harlow* is intended as a shield against liability but cannot become an insuperable barrier; therefore, public officials lose immunity in the face of clearly established law. However, because a rule of law determined by a balancing of interests is inevitably difficult to clearly anticipate, it follows that where *Pickering* balancing is required, the law is less likely to be well established than in other cases. We believe that except for case-by-case analysis and application, the rule cannot be better stated than in *Harlow* itself with careful consideration of its underlying principles."

*Id.* at 728–29 (footnote omitted).

■ As set out in Part II B. *supra*, at the time the relevant events took place in this case, the law was clear that a public employee had a constitutionally protected right to bring waste, mismanagement, or other matters of public concern to the attention of the responsible administrative entity. Nevertheless, "[q]ualified immunity analysis requires that the court consider the operation of the rule in the context of ' "the circumstances with which the [the official] was confronted." ' " *Id.* at 729 (quoting *Giacolane v. Abrams*, 850 F.2d 79, 85 (2d Cir.1988)). Consequently, we must ascertain whether "the protected nature of [Schalk's] speech was sufficiently clear that [Gallemore] should have been on notice that [his asserted interest in preventing disruption] would not survive a balancing inquiry." *Id.* Specifically, we must determine whether it would have been clear to a reasonable official that Schalk's letter was addressed to matters of public concern, rather than an unprotected statement of personal grievances. *See Connick*, 461 U.S. at 146–48, 103 S.Ct. at 1690–91.

Although we conclude in Part II B.1. that the letter is properly viewed as directed to matters that are of public concern, we acknowledge that the issue is not clear-cut. Although the question is a close one, we cannot say that a reasonable official should have known that Schalk's allegations raised matters of public concern as a matter of clearly established law. We therefore conclude that Gallemore is entitled to qualified immunity in a claim for damages against him individually.

**IV**

In conclusion, we hold that Melva Schalk's speech was protected under the First Amendment. However, James Gallemore is immune from liability. We remand for further proceedings with regard to the issue of Gallemore's immunity in his official capacity. The decision of the United States District Court for the District of Kansas is AFFIRMED in part and REMANDED for further proceedings consistent with this opinion.